THE PEOPLE OF PUERTO RICO, ETC., Plaintiff, Appellee, and Appellant, *v.* MERCEDES SALDAÑA QUINTERO ET AL., Defendants, the former Appellant, and Appellees.

No. 9726. Argued December 8, 1948.—Decided March 25, 1949.

G. *Rivera Cestero* and *A. Castro Fernández* for appellant-appellee. *Vicente Géigel Polanco, Attorney General (Luis Negrón Fernández,* former *Attorney General,* on the brief). *Antonio Riera,* for appellee-appellant.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

The People of Puerto .Rico, at the request of the Land Authority of Puerto Rico, and represented by the Governor, filed this condemnation proceeding on September 17, 1946 in the District Court of Bayamón.[1] It deposited in said court the amount of $68,716.62 as the just and reasonable compensation of a property having 209.4125 *cuerdas* (acres)

---

[1] The Court of Eminent Domain of Puerto Rico was not created until 1948 by Act No. 223 of May 15, 1948.

situated in Toa Baja and bounded by other properties of the Land Authority. It was alleged in the complaint that the property belonged to certain defendants who were named and that the condemnation was sought in order to carry out the objects and purposes of the Land Law of Puerto Rico, namely:

"(a) Establishment of farms of proportional benefit in parcels whose extension fluctuates between 100 and 500 acres to be dedicated principally to the planting and cultivation of sugar cane in harmony with the provisions of Title IV of said Land Law;

"(b) Distribution and transfer of land to a number of 'squatters' (agregados)[1a] at the rate of one parcel of not less than one-fourth of a cuerda, nor more than three cuerdas per family, in which said 'squatters' may erect their dwellings in harmony with the provisions of Title V of said Land Law;

"(c) Distribution and operation of lands in individual farms whose areas shall fluctuate between 5 and 25 cuerdas in harmony with the provisions of Section 25 and following of said Land Law."

It was finally alleged that the above purposes are of public utility and that the taking of the property for the Authority is also a public necessity pursuant to § 11 (a) of the Land Law, as amended by Act No. 8 of November 20, 1942.

The complaint was accompanied with a Declaration of Taking, signed by the Governor of Puerto Rico, and the Petition of Taking, signed by the Attorney General of Puerto Rico, asking the court to order, pursuant to § 5 (a) of the Eminent Domain Act, as amended by Act No. 19 of November 30, 1942 (Spec. Sess., p. 82), that title to the condemned property be vested in the Land Authority from the filing of the declaration. The court so ordered on the same day.

Three of the defendants appeared alleging to be owners of a five-sixteenth interest in the property and requested

---

[1a] In *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F. 2d 316, the Circuit Court refers to the *agregados* as "squatters" and cites the definition given in § 78 of the Land Law.

delivery of the proportionate share of the money deposited, without prejudice to their rights to claim the compensation they deemed just and reasonable and the court so ordered.

The other defendant, Mercedes Saldaña Quintero, filed a motion to dismiss. In her answer she raised several legal questions challenging the propriety of the proceeding as well as the constitutionality of the statutes on which it was based.

The lower court denied the motion of dismissal and after the trial, rendered judgment for plaintiff ordering it to pay to the defendant the amount of $94,235.62 as the just and reasonable value of the condemned property, deducting therefrom the amount of $68,716.62, which plaintiff had already deposited. That is, that plaintiff would only have to pay $25,519, plus interest at the legal rate of 6 per cent on the latter amount, from the filing of the complaint on September 17, 1946 until full payment. The defendant, Mercedes Saldaña Quintero, moved for a reconsideration but it was denied.

Both the plaintiff and the defendant have appealed from the judgment. In its appeal plaintiff merely assigns one error as committed by the lower court, that is, in weighing the evidence and in deciding that the just value of the condemned property was $94,235.62 and not $68,716.62. Since the defendant alleges in her appeal, among other errors, that even the compensation granted by the lower court is inadequate, we leave these two errors to be considered jointly. We shall now pass on the other errors assigned by the defendant-appellant.

These are to the effect that the lower court erred in denying: (1) the motion for dismissal and (2) the legal defenses alleged by the defendant in her answer.

■ Appellant's first contention is that the lower court lacked jurisdiction to order the condemnation in the absence of an administrative decision declaring the condemned lands necessary or advantageous to carry out the purposes of the Land Authority.

The allegations of the complaint, already quoted in this opinion, state, in our judgment, facts sufficient to constitute a cause of action and clothe the court with jurisdiction. Sections 11 and 11(a) of the Land Law of Puerto Rico; *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F. 2d 316 (Certiorari denied on November 12, 1946); *Old Dominion Land Company* v. *United States*, 269 U.S. 55, 70 L. ed. 162; *United States* v. *40.75 Acres of Land, etc.*, 76 F. Supp. 239.

The mere filing of the petition by The People of Puerto Rico, at the request of the Land Authority, with the allegations copied above, shows that the Lands were necessary or convenient for the purposes of said Authority. As stated in *Old Dominion Land Company* v. *United States, supra:*

" . . . . . . . .

"Some question is made as to whether a letter from the Secretary of War to the Attorney General sufficiently authorized the present proceedings by showing that in his opinion it was necessary or advantageous to the Government to take them. The Act of August 1, 1888, c. 728; 25 Stat. 359, allows the Secretary to acquire by condemnation lands which he is authorized to procure for public purposes, 'whenever in his opinion it is necessary or advantageous to the Government to do so'; gives jurisdiction to the courts of the United States, and makes it the duty of the Attorney General upon every application of such officers to cause proceedings to be commenced. We perceive no requirement that the Secretary should go further than to apply to the Attorney General. . . ."

Section 11 of the Land Law provides that at the request of the Authority, the Insular Government shall have power to acquire, in the name of the Authority, by condemnation ". . . title to any real property or estate [interest] thereon which might be necessary or advisable for the purposes of the Authority . . ." and since the nature of those purposes were alleged in the complaint the court had jurisdiction.

 Appellant further contends that the allegations do not reveal that the land sought to be condemned is for public use and that since appellant is not a corporation, partner-

ship, or other artificial, instrumentality of perpetual life and since it does not possess more than 500 acres, this condemnation does not constitute a public use or public purpose, and violates one of the provisions of the Land Law to the effect that the Authority is created "to insure to individuals the conservation of their lands."

We have already decided in *McCormick* v. *Marrero, Judge*, 64 P.R.R. 250, 256, where the property sought to be condemned by the People of Puerto Rico in behalf and for the use of the Land Authority, for the purpose of distributing it among a number of *agregados*, was only of 129.33 acres, that:

"The Legislature is clothed with wide discretion in determining what constitutes a public use and in adopting such measures as, in its judgment, will promote the welfare of the community. It is not the function of the courts to pass on the wisdom or expediency of particular legislation. If the latter contains the elements of public benefit, and the purpose sought to be accomplished is of a public character, the question as to how much benefit is to be derived by the public is one for the legislature, and not the courts. A stronger presumption arises in favor of the public nature of a proposed use when the appropriation is made on behalf of the government instead of by a private corporation. (Authorities)

". . . . . . . . .

A mere reading of the pertinent provisions of the Land Law, under which it is sought to condemn petitioners' property, is sufficient to convince us that the purpose to which said property is to be devoted is of a public character, and that, in our judgment, it will greatly contribute to raising the standard of living of our working class. . . ."

Appellant argues that the *McCormick* case is not applicable to the case at bar because there the question of whether the condemnation was contrary to one of the purposes announced in the Land Law was not raised. It is true that said question was not raised in that case, but we are inclined to believe that if it had been, the result would have been the same. The fact that § 7 of the Land Law, as amended

by Act No. 197 of May 11, 1942 (Sess. Laws, p. 996),[2] includes among the purposes for which the Authority was created "to insure to individuals the conservation of their land" does not mean that when the People of Puerto Rico institutes the condemnation proceeding, the Authority can not take land which belongs to private individuals and not to corporations or partnerships, to be used in some or all the public purposes enumerated in the Act. This question was impliedly decided in a former appeal in this case. *People v. Saldaña,* 68 P.R.R. 865, 867, where we held that the power to take by condemnation conferred on the Authority was limited by § 14 of the Land Law (as amended by Act No. 8 of March 29, 1945) to cases:

". . . against artificial persons who, by possessing more than five hundred acres, are violating the provisions of this Act, and such power of expropriation shall not be exercised against natural persons unless the lands in question belonged, on February 10, 1941 to some artificial person as defined in said Title III."

And consequently that:

"Therefore, the cases where the Land Authority of Puerto Rico may by itself institute condemnation proceedings are expressly limited by law. In all other cases, like in the one at bar, if said Authority wishes to acquire title or interest on any

---

[2] Said Section provides:

"Section 7.—The Authority is created for the purpose of carrying out the agricultural policy of The People of Puerto Rico as determined in this Act, and to take the necessary action to put an end to the existing corporative latifundia in this Island, block its reappearance in the future, insure to individuals the conservation of their land, assist in the creation of new landowners, facilitate the utilization of land for the best public benefit under efficient and economic production plans; provide the means for the *agregados* and slum dwellers to acquire parcels of land on which to build their homes, and to take all action leading to the most scientific, economic and efficient enjoyment of land by the People of Puerto Rico; *Provided,* That none of the provisions of this Act are to be construed as limiting the right of the Land Authority of Puerto Rico or of the organizations, entities, or agents created or authorized by it to carry out the purposes mentioned in the preceding paragraph to hold, control, possess, use and develop agricultural lands with an area in excess of 500 acres."

real property, either by purchase or by condemnation, it must comply with Section 11 of the Land Law [3] and request that the action be brought in the name of the Insular Government, that is, The People of Puerto Rico."

It is true that according to the Declaration of Policy of the Land Law the essential purpose of the Act is:

". . . to put an end to corporative latifundia and to every large concentration of land in the hands of entities legally organized in such wise as to tend to perpetuate themselves. . ."

but in the Declaration it also appears that:

"This fundamental public policy would not be complete if it were not accompanied by, as a corollary germane to its nature and scope, of the purpose of providing that in the case of land where, for natural or economic reasons, the division of the land is not advisable from a standpoint of efficiency, the greatest diffusion possible of the economic benefits of the land may still be effected, thereby contributing to raise substantially the standard of living of the greatest possible number of families. It is with a view to this phase of the legislative purpose that it is considered indispensable to make provision for the creation of proportional-profit farms through which the diffusion of the wealth may be effected, to the point efficiency makes advisable, without the parceling of the land. It is also an integral part of the moral purpose and the aims of dignity and economic freedom embodied in the public policy of the Legislature, to furnish the means whereby the social class of *agregados*, or, that is, of agricultural laborers enslavened through the fact that they are not the owners of even the lot where they have their homes, will disappear from Puerto Rico; and to that end the Legislature states the fundamental human right of all the human beings who live exclusively by the tilling of the soil, to be the owners of at least a piece of that land which they

---

[3] Section 11 provides that "The Insular Government shall have power to acquire, at the request of the Authority and in behalf thereof, by purchase, or by expropiation in the manner provided by this Act and Insular laws in regard to expropriation, title to any real property or estate thereon which might be necessary or advisable for the purposes of the Authority, and the latter shall pay for the whole of said real property. The power hereby vested shall not limit or restrict the power of the Authority itself to acquire real property by purchase or expropiation."

may use to erect thereon, in the full enjoyment of the inviolability guaranteed by law for the homestead of the citizen, their own homes, thereby delivering them from coercion and leaving them free to sell their labor through fair and equitable bargaining."

If the People of Puerto Rico is convinced that the object pursued by the Land Authority in seeking the condemnation of land of less than five hundred acres belonging to private persons is advisable and necessary for the public purposes set forth in the law, it may institute said proceeding. The power of condemnation of the State in such cases is not limited to cases where the defendant is a corporation, partnership, or artificial entity holding land in violation of the law. It merely exercises its inherent power to expropriate for public purposes upon payment of adequate compensation.

*McCormick* v. *Marrero, Judge, supra,* is applicable to the case at bar and so is *People of Puerto Rico* v. *Eastern Sugar Associates,* 156 F. 2d 316, (C.C.A. 1, 1946) certiorari denied on November 12, 1946 where, although the case dealt with condemnation of land situated in the Island of Vieques in order to protect the economic situation of said island, as expressed in Act No. 90 of May 11, 1944, said proceeding was instituted under the authority of the Land Law, *supra,* it being alleged in the petition of the People of Puerto Rico that the public purposes for which the land would be used, are identical to those in the present action copied above. To this effect the Circuit Court said on page 320:

". . . The basic question presented is whether on the pleadings it can be said that the appellees' land is sought to be taken for a public use. And this requires consideration of the nature as public or private of four possible uses to which the land here involved may, if acquired, be put, to wit, *the three specific uses enumerated in the Land Law* and in addition the more general use permitted by the Vieques Act." (Italics ours.)

Therefore, the Vieques Act was not, as urged by appellant, the only one construed in said case. In deciding the basic question set forth, the court said, on page 323:

672

"The four contemplated uses for the land enumerated above are closely inter-related. Each use plays a part in a comprehensive program of social and economic reform. Thus we see no basis for analyzing each proposed use separately. Instead we think the entire legislation should be regarded 'as a single integrated effort,' *United States ex rel. Tennessee Valley Authority* v. *Welch,* 66 S.Ct. 718, to improve conditions on the island, and so viewed we think enactment of the statutes within the power of the Insular Legislature.

and on page 325:

". . . But enough has been said to indicate both that the Puerto Rican Legislature's belief in the existence of a serious economic and social problem was not arbitrary, and that the program to provide not only homesteads and proportional profit farms for *agregados* and subsistence farms for more skilled farmers, *on the Island of Puerto Rico* proper, but, in addition to the foregoing, to provide for the renewal of sugar cane grinding and the development of the liquor industry on the Island of Vieques, *embodied means reasonably calculated to deal with these problems."* (Italics ours.)

Accordingly, we are not accepting the legislative fiat that the purposes expressed in the Land Law are of a public character, but that this Court as well as that for the First Circuit, have affirmatively decided that the People of Puerto Rico, in making use of the condemnation power for the purposes stated in the Land Law is not violating the due process clause. As stated by the Circuit Court, we deem it unnecessary to attempt to decide ". . . the question upon which the Supreme Court was apparently divided in *United States ex rel Tennessee Valley Authority* v. *Welch et al.,* 66 S. Ct. 715, that is, the question whether a legislative decision that a taking is for a public use is subject to judicial review . . . because even if it is one within our competence, we think the taking here attempted does not violate 'due process.'" (Pages 322–3, case cited.)

The error assigned, therefore, was not committed.

■ Plaintiff as well as defendant in their appeal charge the lower court with having erred in weighing the evidence

and in determining the value of the condemned property in the following terms:

"· · · · · · · ·

"According to the witnesses for the defendant, this property has a value of not less than $700 per acre. According to plaintiff's, the property has a value of $328 per acre.

"The other things on which witnesses for both parties agreed, are as follows:

"*a.* The property is plain; *b*—well situated near the sugar mill and with a road leading thereto, and crossed by a railway; *c*—the land is suitable for the planting of sugar cane and produces a good tonnage of cane.

"According to the evidence, the court makes the following findings:

"1. The property sought to be condemned was suitable for the purposes to which it is devoted;

"2. The property has an area of 209.4125 acres;

"3. The value per acre of this property is $450, which amounts, in the opinion of the court, to the just and reasonable value of $94,235.62."

In the case at bar the lower court had no evidence as to voluntary sales of land similar to appellant's as to which the selling prices paid shortly before condemnation could be compared. From the evidence introduced by the plaintiff we take the testimony of Mr. Rafael Méndez Roig, Chief Industrial Engineer of a Division of Land Authority, who made a survey of the property, calculating the value per acre of each type of ground on the basis of its productivity and considering also the rental yield of the property to former owners, its location, means of communication, drainage, etc., having reached the conclusion that the just and reasonable value was $328 per acre.

Francisco López Domínguez, defendant's witness, Manager of Central Monserrate, testified that he knows the property; that from his experience with land of that type, the northerly coast of Puerto Rico, it should yield an average, counting ratoons, *primavera* and fall planting (*gran cul-*

*tura*) of 40 tons and that the market value of the condemned land was, in his opinion, from $700 to $800 per acre. Mr. Mariano Maris, a graduate agronomist in 1921, who for 16 years has been inspector of the northern coast of the Department of Agriculture, inspected the "Ortega" Estate and after considering the types of ground, the distance from the mill, topography, nearness to San Juan productive capacity of the property, stated that the property was worth $700 per acre. Prior to the condemnation the property was leased to the Land Authority for a net monthly rental of $400, the lessee having to pay the taxes. The evidence also shows that the Ortega Estate is in Toa Baja; that all of it is a plain; that it is near a sugar mill; that its roads are paved and that it has always been devoted to the cultivation of cane.

In *People v. García*, 66 P.R.R. 478, 483, this Court expressed itself as follows:

"Experience shows that among the most competent witnesses there is frequently a wide diversity of opinion as to the value of the same property. As stated in *Welch* v. *Tennessee Valley Authority*, 108 F. 2d 95 (C.C.A. 6th, 1939), there is no single measure of value which may be applied rigidly and uniformly in the determination of the market value of lands and each case must be considered in the light of its own facts."

In the light of the facts of this case we do not think that the compensation granted by the lower court is excessive, as plaintiff contends, nor insufficient as alleged by defendant. Nor have we been convinced by the parties that the court, in fixing the compensation, committed manifest error. See *People* v. *Muñoz, ante*, p. 89.

■■ Appellant finally alleges that since she had a lease contract with the Land Authority, the latter was bound to sell the ratoons of the plantation to her at the same price that she sold them to the Authority. She asks for compensation for the loss sustained. The contract made with the Authority expired in 1951 the Authority being entitled to an extension until 1957.

Appellee maintains, very properly in our opinion, that no exact calculation can be made, and in fact was not made at the trial, of the amount of ratoons which, if the property had not been condemned, might exist in 1951 or in 1957, subject to revert to the defendant. It is true that appellant was entitled to repurchase said ratoons at the expiration of the contract of lease if the property had not been condemned. However, speculative and indefinite damages cannot be granted on the basis of a right that has vanished. As stated in *People of Puerto Rico* v. *United States*, 132 F. 2d 220, 222:

"We are aware of no rational means by which to determine the value of the possibility that at some indefinite time in the future the land might revert to the People of Puerto Rico. All that can be done is to venture a guess, and it is elementary law that damages cannot be assessed by mere guesswork. . . ."

The judgment appealed from will be affirmed.

Mr. Justice Negrón Fernández did not participate herein.